OTTER TAIL POWER COMPANY, Respondent
v.
SIOUX VALLEY EMPIRE ELECTRIC ASSOCIATION, Inc., et al., Appellants

(131 N.W.2d 111)

(File No. 10175.  Opinion filed October 30, 1964)

**Louis H. Smith,** Sioux Falls, **Leo P. Flynn,** Milbank, for defendants and appellants.

**Davenport, Evans, Hurwitz & Smith,** Sioux Falls, **Field, Arvesen, Donoho & Lundeen,** Fergus Falls, Minn., for plaintiff and respondent.

HANSON, J.   This is a sequel to the case of Smith v. Otter Tail Power Company, 80 S.D. 327, 123 N.W.2d 169, in which the Otter Tail Power Company seeks to have itself declared the proper supplier of electric energy to a farm located in Moody County, South Dakota, to the exclusion of the Sioux Valley Empire Electric Association, a rural electric cooperative. Plaintiff further requests injunctional relief to restrain the defendant farm owner, Louis H. Smith, the farm tenant, Gerrit Van Dyke, and the Sioux Valley Electric Association from changing, cooperating, or conspiring to change electric suppliers to the farm from investor-owned Otter Tail to the Sioux Valley rural electric cooperative. On application of Otter Tail an interlocutory injunction was granted and defendants have appealed.

As this action has not been tried on its merits it is necessary to obtain background facts from the complaint, affidavits, and other pleadings of record. The complaint alleges:

"I.

"Plaintiff Otter Tail Power Company (Otter Tail) is a Minnesota corporation duly authorized to do business in the State of South Dakota. Otter Tail is an investor-owned public utility corporation engaged generally in the business of generation, transmission, distribution and sale of electrical energy to the public in portions of the three states of South Dakota, North Dakota, and Minnesota. Otter Tail owns and operates an interconnected system of transmission and distribution lines, with generating stations located at strategic points thereon. Otter Tail's system is interconnected with other suppliers in the area.

"II.

"Otter Tail's service area in South Dakota includes, among others, the County of Moody, and includes customers both in municipalities and in rural areas. In particular, Otter Tail's service area includes the Smith farm premises hereinafter specifically referred to. Otter Tail's lines go right by said Smith farm premises. Otter Tail, and its predecessors, have served this and other service areas for many years.

"III.

"The defendant Sioux Valley Empire Electrical Association (Sioux Valley) is an electric cooperative under the laws of South Dakota, which is organized and financed for the purpose of bringing electric service to rural areas not already receiving central station service. Among others, Sioux Valley has some lines and customers in Moody County, but its lines are located some distance from the Smith farm premises hereinafter referred to. Sioux Valley receives loans from the Rural Electric Administration under 7 U.S.C.A. Secs. 901-914, as amended, under which Congress has provided capital loans and a low rate of interest to encourage and subsidize the construction of facilities to bring electric service to rural areas not already receiving central station service. Sioux Valley also enjoys income and property tax advantages which are provided by law for electric cooperatives and which have the result of further encouraging and subsidizing the cooperative method of bringing electric service to rural customers not already receiving service.

"IV.

"Defendant Louis H. Smith (Smith) is the owner of, and defendant Gerrit Van Dyke (Van Dyke) is the tenant operating, a farm premises described as follows:

Southwest Quarter (SW¼) and the South Half of the Northwest Quarter (S½NW¼) east of the

railroad right of way, Section Thirteen (13), Township One Hundred Six (106), Range Forty-nine (49), Moody County, South Dakota.

Said farm premises are herein sometimes referred to for convenience as the Smith Farm.

## "V.

"In 1954, Otter Tail, at the instance and pursuant to the request of Smith for electric service, constructed and extended the necessary service lines and other equipment to bring electric service to the Smith farm. Such electric service is now a necessity for the operation of the Smith farm, and is used for the following purposes, among others:

Refrigerator
Water Heater
Milking Machine
Milk Cooler
Water Pump
Oil Burner (furnace heating the house)
Television
Radio
Electric Welder
Lights, Toaster & Miscellaneous small pieces of equipment.

## "VI.

"In 1961, Smith demanded that Otter Tail discontinue electric service to the Smith farm, and brought a mandamus against Otter Tail to compel the disconnection of service by Otter Tail. Otter Tail defended that proceeding on the general basis and grounds that: Otter Tail is the proper supplier of this public utility service to this customer; that its lines are immediately adjacent to said premises; that it had been requested to extend and give such service, and had made the necessary investment in service lines and equipment therefor; that

it is the present supplier of electric service; that the Smith farm was thereby already receiving central station service; that neither Smith nor Van Dyke intended to discontinue electric service, but on the contrary intended to secure electric service from Sioux Valley; that Sioux Valley is not the proper supplier, nor was it organized or financed for the purpose of bringing service to a customer already receiving central station service, or to destroy the investment of an investor-owned utility in bringing such service to this customer. Said mandamus proceeding was appealed to and decided by the Supreme Court of South Dakota, and the files and records in said proceeding are hereby referred to and incorporated herein. In said proceeding, the Supreme Court held, in substance, that Smith had the legal right to compel the discontinuance of electric service from Otter Tail regardless of his motive, and, in substance, declined in that proceeding to consider or decide the issues involved in the merits of whether Sioux Valley should be substituted as the supplier of electric energy to this customer. In substance, this action is commenced to present the merits of the real controversy presented by this situation to the Court for decision.

## "VII.

"It is alleged, on information and belief, that neither Smith nor Van Dyke intended to discontinue electric service to the Smith farm, but on the contrary intend to secure electric service from Sioux Valley; that Sioux Valley will pay only 'lip service' to its announced policy, that it will not extend service to one already receiving central station service, and that it will permit and cooperate and conspire in permitting itself to ostensibly be compelled to extend electric service to the Smith farm, as a potential customer without electric service, or to otherwise arrange, or cooperate and conspire in arranging, to become the electric supplier to the Smith farm, in substitution for the investor-owned utility (Otter Tail).

## "VIII.

"Plaintiff has no adequate remedy at law. Plaintiff, and the consuming public served by this investor-owned utility, will be irreparably damaged and injured if relief is not given herein.   *   *   *."

It further appears that under compulsion of the judgment in the case of Smith v. Otter Tail Power Company, 80 S.D. 327, 123 N.W.2d 169, plaintiff removed its meter from the Smith farm on March 10, 1964. Its poles, wires and equipment remain in place under its easement. Shortly after Otter Tail disconnected service the tenant, Van Dyke, applied for an alternative writ of mandamus to compel Sioux Valley to furnish electric service. Otter Tail was not made a party to such action and alleges it was a friendly proceeding commenced by defendants in furtherance of a common design to create the appearance of a farm not receiving central station power whereby Sioux Valley would ostensibly be compelled by court order to extend service contrary to their announced policy of not serving a customer already receiving central station power. A writ of mandamus was issued by the Honorable Francis G. Dunn on March 17, 1964. There followed considerable legal maneuvering as a result of which Judge Dunn, on his own motion, vacated the peremptory writ of mandamus and disqualified himself from acting further in the matter. No appeal was taken in the mandamus action and the Honorable Harold O. Lund was appointed to act in place of Judge Dunn. He issued the interlocutory injunction in the present proceeding from which defendants have appealed. They contend the trial court abused its discretion granting the injunction as Otter Tail has no standing or capacity to complain; the issues are res adjudicata; and Otter Tail has shown no injury and no protectible right in the subject of this action.

■ ■ SDC 1960 Supp. 37.4304 authorizes the issuance of an interlocutory injunction in the following cases:

"(1)   When it shall appear by the complaint that the plaintiff is entitled to the relief demanded, and such relief or any part thereof consists in restrain-

ing the commission or continuance of some act, the commission or continuance of which, during the litigation, would produce injury to the plaintiff;

"(2)  When, during the litigation, it shall appear that the defendant is doing, or threatens * * * to do * * * some act * * * in violation of the plaintiff's rights respecting the subject of the action * * *."

This remedy does not issue as a matter of course, Duke v. Bruce Independent School District, 77 S.D. 568, 96 N.W.2d 172, and the right to relief must be established with reasonable certainty, Hofer v. Bridgewater Independent School Dist., 76 S.D. 483, 81 N.W.2d 300, by showing the threat of substantial injury or the threatened invasion of some legal right respecting the subject of the action. Plaintiff has failed to sustain this burden.

■   In general the courts have sustained the right of an electric or power company operating under a franchise from a municipality or other public body, to enjoin unlicensed, illegal, or unauthorized competition by another. For cases and comprehensive annotation of subject see 90 A.L.R.2d 7. However, in the rural areas of South Dakota competition in the field of electric energy has not been replaced or modified by regulation. Neither the investor-owned utility nor the rural electric cooperative is under the jurisdiction of the Public Utilities Commission. Consequently neither can claim any regulatory rights therefrom.

Otter Tail does not allege, or claim to have, an express or exclusive franchise or territorial right in the area of the Smith farm. It has only the right, granted by the Board of County Commissioners, pursuant to SDC 1960 Supp. 28.1001, "to erect and maintain poles and wires for the purpose of conducting electricity for lighting, heating, and power purposes * * * in and along any public highway * * *", but the grantee of such right "shall not in any case have the exclusive right to use such highway for the conducting of electricity * * *." In the case of Smith v. Otter Tail Power Company, 80 S.D. 327, 123 N.W. 2d 169, this court held Otter Tail had no contract or public utility right

to continue furnishing electric service to the Smith farm in defiance of the owner's request for discontinuance. It was further determined that Smith had a clear and absolute right "to a discontinuance of electric service to his premises regardless of the motive which induced him to desire it".

■ Notwithstanding, Otter Tail contends, as it did in the prior case, that the Federal Rural Electrification Act of 1936, 7 U.S.C.A. § 901 et seq., authorizing the Administrator of the Rural Electrification Administration to loan funds to cooperatives and others for the purpose of furnishing electric energy "to persons in rural areas who are not receiving central station service" is an implied limitation on the authority of Sioux Valley to furnish electric service to any persons in the rural areas of our state who are receiving central station service from another source. The same contention was advanced in the case of Missouri Power & Light Co. v. Lewis County Rural Electric Coop. Ass'n., 235 Mo.App. 1056, 149 S.W.2d 881, and in our opinion correctly and fully answered by the Missouri court as follows:

"If such had been the purpose of the lawmakers they would have most likely provided that the area of the borrower be fixed within certain limits, and the borrower limited in its operations to that area, and all others selling electric current be excluded. For obvious reasons that was not the purpose. We think it more likely that the lawmakers foresaw a situation like we have here, where the area of the borrower and that of some central station selling electric current might overlap to at least some extent, and in such case the borrower in its application for a loan could not qualify by counting in its project plan a person or persons already receiving service nor even count such person or persons as potential patrons; but after the loan was made there would be no possible way of preventing legitimate competition between the two service stations as to new patrons or as to the extent that a dissatisfied patron of either service would have the right to quit the one and buy from the other. The very fact as alleged in the petition that both relator and respondent are incorporated for the purpose

of selling electric current within the State of Missouri would make them potential competitors. Under their corporate powers, as alleged in the petition, either and both had a right to sell electric current in Missouri and in Lewis County. The lawmakers must have foreseen that just such a situation as here would present itself in many sections of the county, and they had no intention of regulating or restricting the business operations of a borrower after the making of a loan. We think the qualifying words 'to persons in rural areas who are not receiving central station service' have reference to the time of the application for the loan, and if at that time the borrowers express or ostensible purpose was competitive, the loan would be refused; but if at that time the borrower complied with the law, and in this case it is not claimed that it did not, the fact that its business thereafter became competitive with others engaging in like business, would not make such business unlawful."

Cases from other jurisdictions cited by Otter Tail fail to support its contention in this respect. Each involves the construction and application of a state Rural Electrification Act which expressly incorporates the restriction contained in the Federal Act relating to central station service. The Rural Electrification Act of Florida involved in Tampa Electric Co. v. Withlacoochee River Elec. Coop., Fla., 122 So.2d 471, provides that "no cooperative shall distribute or sell any electricity, or electric energy to any person residing within any town, city or area which person is receiving adequate central station service or who at the time of commencing such service, or offer to serve, by a cooperative is receiving adequate central station service from any utility agency, privately or municipally owned individual partnership or corporation". The Arkansas Rural Electrification Act applied in Arkansas Elec. Coop. Corp. v. Arkansas-Missouri P. Co., 221 Ark. 638, 255 S.W.2d 674, permits a rural cooperative to transmit, distribute, sell, furnish, and dispose of electric energy "to its members only". Membership is confined to "All persons in rural areas proposed to be served by a corporation, who are not receiving central station service * * *." The Electric Membership Corporation Act of Georgia involved and applied in City of

Moultrie v. Colquitt County Rural Elec. Co., 211 Ga. 842, 89 S.E.2d 657, and in Georgia Power Co. v. Okefenokee Rural Elec. Mem. Corp., 217 Ga. 219, 121 S.E.2d 777, declares the purpose of such Act to be that of furnishing electric energy "to persons in rural areas who are not receiving electric service from any corporation subject to the jurisdiction of the Georgia Public Service Commission, or from any municipal corporation." The Texas Electric Cooperative Act construed in State ex rel. Southwestern Gas & Electric Co. v. Upshur Rural Electric Cooperative Corp., Tex., 298 S.W.2d 805, authorizes the organization of cooperatives for the purpose of furnishing "electric energy to persons in rural areas who are not receiving central station service." In considering the Montana Rural Electric Cooperative Act in Montana Power Co. v. Park Electric Co-operative, 140 Mont. 293, 371 P.2d 1, the court observed that it was more restrictive than similar statutes in other states. The court said their Act "spells out the limits of the Co-operative service, restricting it to rural areas **and** where service is not otherwise available from existing facilities and plants."

The defendant, Sioux Valley Empire Electrical Association is an electric cooperative organized under the South Dakota Electric Co-operative Law, SDC 1960 Supp. 11.22, which states the purpose to be that "of supplying electric energy and promoting and extending the use thereof, in rural areas." Rural areas are defined as "any area not included within the boundaries of an incorporated or unincorporated city or town having a population in excess of fifteen hundred inhabitants, and includes both the farm and non-farm population thereof." If the Montana Rural Electric Co-operative Act is one of the most restrictive of its kind, ours is one of the most liberal and nonrestrictive. In construing the similarly liberal Rural Electric Co-op. Act of South Carolina in Heath Springs Light & P. Co. v. Lynches River E. Coop., 231 S.C. 34, 97 S.E.2d 79, the court said "It is significant to note that the act fails to limit or is silent as to the right of a cooperative organized under the Chapter to serve the various designated persons or agencies or subdivisions where they are being served by private electric companies, and, it must, therefore, be assumed that the legislature intended for the cooperatives organized under the laws of such title to serve customers and governmental

agencies and political subdivisions in all rural areas of the State of South Carolina regardless of whether or not the said rural areas were then or hereafter being served by private electric utilities."

The South Dakota Electric Co-operative Law constitutes a declaration of public policy with reference to the organization and operation of rural electric co-operatives in this state. Territorial and other competitive restrictions on their conduct are variable matters of legislative concern. We cannot add restrictions by interpretive implication.

As Otter Tail has failed to allege or show the threatened invasion of any protectible franchise, public utility, or contractual right to continue serving electric energy to the Smith farm, it has no standing to complain of others lawfully doing so. Where two utilities are authorized by law to serve the same rural territory consumers therein are free to choose and to change their supplier. Cass County Electric Coop. v. Otter Tail Power Co., N.D., 93 N.W.2d 47. An injunction may be issued only to prevent unlawful competition. Sheridan County Elec. Co-op. v. Montana-Dakota U. Co., Mont., 270 P.2d 742, and see annotation 90 A.L.R.2d 7 et seq.

Reversed with instructions to vacate and set aside the order granting the interlocutory injunction.

All the Judges concur.